UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CIVIL ACTION NO. 1:19-CV-00209 (WOB-SKB)

LAYNE RICE,                                          PLAINTIFF,

VS.                    MEMORANDUM OPINION AND ORDER

CITY OF CINCINNATI.                                  DEFENDANT.

This is an employment dispute brought under Title VII of the
Civil Rights Act of 1964, 42 U.S.C. § 2000e, et. seq., 42 U.S.C.
§ 1981A, 42 U.S.C. § 1981, and Ohio Revised Code § 4112.99 by an
African American male who alleges that he was disparately impacted
by the City of Cincinnati's ("the City") felon disqualification
policy and retaliated against when the City did not hire him
following several complaints about the City's policy. (Doc. 1).

Before the Court are three motions. First, the City filed a
motion for summary judgment. (Doc. 23). Second, Layne Rice filed
a cross-motion for summary judgment. (Doc. 24). Third, Rice filed
a motion to re-open discovery. (Doc. 27).

The Court has carefully reviewed this matter and concludes
that oral argument is unnecessary. The issues being ripe, the Court
now issues the following Memorandum Opinion and Order.

***Factual and Procedural Background***

**A. <u>Introduction</u>**

The following facts are not disputed. Rice is a forty-two-year-old African American who sought to become a firefighter. (Doc. 18 at 11:16-19, 51:4-5).

Rice first applied to the Cincinnati Fire Department ("CFD") in 1999, around the age of twenty-one. (*Id.* at 34:17-19). Despite passing all portions of the exam, Rice was not hired as a fire recruit in this class. (*Id.* at 35:9-12).

This led Rice to Cincinnati State Community and Technical College in 2003, where he eventually earned his Ohio Department of Public Safety certifications for Volunteer Firefighter, Level I Firefighter, Level II Firefighter, and Basic EMT. (*Id.* at 8:12-9:1); *see also* (Doc. 18-1).

Shortly after obtaining his certifications, Rice was charged with Aggravated Trafficking in Drugs for possessing marijuana and cocaine in December 2004, a felony offense under Ohio Revised Code § 2925.03. (Doc. 18 at 28:10-15). Rice pled guilty to both counts in September 2005, and he was imprisoned for eighteen months. (*Id.* at 29:19-30:14).

Rice went back to Cincinnati State and completed his Associate's Degree in Fire Service Technology in 2012. (*Id.* at 8:9-11). Then, he submitted applications to the Springdale Fire

Department, Columbus Fire Department, and, most pertinent, the CFD in 2012, 2015, and 2018. (*Id.* at 23:20-24:15).

B. **CFD Fire Recruiter Hiring Process**

The process to become a firefighter in Ohio is lengthy and competitive. (Doc. 21 at 11:19-24). The process begins when the CFD posts a public notice soliciting applications. (*Id.* at 15:13-15). The application period remains open for approximately three months. (Doc. 20 at 15:21-23). Applicants must fill out a forty-four-page Personal History Questionnaire ("PHQ"), detailing, among many other things, the applicant's criminal record and drug history. (Doc. 21 at 16:5-10).

After this initial documentation is submitted, applicants take a written examination. (*Id.* at 15:13-16:4). Those applicants that pass then proceed to a physical agility test. (*Id.*) If applicants are also successful with the physical test, then they must also undergo an oral examination. (*Id.*) Once the applicant passes all three exams, they are awarded a test score and placed on an eligibility list. (*Id.* at 16:5-8).

The eligibility list is sent to the Civil Service Commission ("CSC") for approval only after the candidate passes all three examinations. (Doc. 21 at 16). Concurrent with the CSC's approval process, CFD staff also review each applicant's PHQ to determine whether there is anything that would disqualify them under state law or city policy. (Doc. 19 at 16-17).

If candidates are disqualified, then they are sent a pre-appeal notice, detailing the reason. (*Id.*) This allows the candidate to challenge their disqualification with the CFD directly. (*Id.*) But even if the applicant is unsuccessful with their pre-appeal, they are given a formal appeal before the CSC pursuant to Civil Service Rule 07, Section 3. (*Id.*)

Assuming the candidate is successful with their formal appeal to the CSC (or if the CSC approves the candidate without issue), then the top 25% of candidates are referred first to Fire Chief Roy Winston for initial consideration. (Doc. 21 at 16:21-23). Chief Winston is vested with final hiring authority. (*Id.* at 18:15-19:1). At this stage, Chief Winston may only consider those applicants in the top 25%. (*Id.* at 17:10-15).

Recruiters compile the applicants' information and send it to the Assistant Chief of Human Resources for further screening. (*Id.* at 17:16-20). The Assistant Chief of HR then provides Chief Winston with a condensed version of applicants' information, including a pros and cons list known as "thumbnails." (*Id.* at 17:18-18:5). A candidate's criminal history is also considered at this point. (*Id.* 19:23-20:1).

After the initial applicants are considered, a larger group of approximately 200 people are compiled for Chief Winston to consider. (*Id.* at 21:1-2). While there is no mathematical formula to determine which candidates to hire, Chief Winston bases his

decision broadly on the candidates' skills, likelihood of passing EMT certifications, his desire for diversity, and his assessment of their trustworthiness to determine if a candidate's weaknesses will leave the CFD vulnerable. (*Id.* at 24:1-6).

C. **Rice's 2012, 2015, and 2018 Employment Applications to the CFD**

Rice was not hired in 2012 because he did not pass the physical agility test. (Doc. 24-1 at ¶ 17). He applied again in 2015 and passed all three portions. (*Id.* at ¶ 21). Rice received a rank of 429th out of 703 candidates, with a score of 81.61. (Doc. 18-5). This placed Rice in the top 61% of candidates to pass the examinations. (*Id.*) Rice included letters of recommendation, prior certifications, and a copy of his college degree in his application. (Doc. 24-1 at ¶ 20). He also disclosed his 2005 drug conviction in his PHQ. (*Id.* at ¶ 19).

On August 4, 2017, after the CFD reviewed Rice's PHQ revealing his felony conviction, Erica Burks (the City's Human Resources supervisor) sent Rice a letter stating "[a]s a result of information gathered during the review, your eligibility for appointment to the position of Fire Recruit with the Cincinnati Fire Department has been terminated." (Doc. 19-2 at 1). The letter explained that Rice was disqualified "based on criteria established by the" CSC for his felony conviction. (*Id.*)

On August 9, 2017, Rice filed a charge with the EEOC, alleging that his disqualification under the City's felon disqualification policy was racial discrimination. (Doc. 19-9).

On August 15, 2017, Rice was invited to participate in the CFD's pre-appeal. (Doc. 20 at 34:19-22). Rice agreed to participate in person with Burks and Lieutenant Harold Wright. (*Id.* at 34:23-35:6). Rice opined the rehabilitation standard set forth in Ohio Revised Code § 737.081(E) as a reason his disqualification was unlawful.[1] (Doc. 24-1 at ¶ 25). Nevertheless, Burks and Wright reaffirmed their decision and informed Rice he had to proceed to the CSC for his formal appeal. (Doc. 20 at 35:14-19).

On October 5, 2017, the CSC heard Rice's appeal concerning his felony disqualification. (Doc. 18 at 43:11-14). The CSC unanimously approved Rice's request to remain on the eligible list. (Doc. 24-8 at 4). The CSC's findings were sent to Rice in a letter, explaining that his appeal was approved and the "next step in the process will be the FBI/BCI Background Check." (Doc. 24-9).

---

[1] ORC § 737.081 was promulgated in 2003. ORC § 737.081(C)(1)(a) provides that a person with a felony is not permitted to be appointed as a permanent, full-time freighter or volunteer firefighter.

However, ORC § 737.081(C)(2) provides that "an appointing authority may appoint or employ a person as a permanent, full-time paid firefighter or a volunteer firefighter if" (1) the fire chief requests a criminal record check; (2) the records show the candidate is guilty of an offense in (C)(1); and (3) the person meets the rehabilitation standards in ORC § 737.081(E).

Subsection E provides: "The appointing authority shall adopt rules in accordance with Chapter 119 of the Revised Code to implement this section. The rules shall include rehabilitation standards a person who has been convicted of or pleaded guilty to an offense listed in division (C)(1) of this section must meet for the appointing authority to appoint or employ the person as a permanent, full-time paid firefighter or a volunteer firefighter."

Nevertheless, Rice was not hired for the 2015 fire recruit posting because of, as the City explained, his drug convictions while he was certified as an EMT, Volunteer Firefighter, and Firefighter I and II. (Doc. 24-2 at 7).

In 2018, the CFD posted another fire recruit notice. (Doc. 18-6). Rice applied once again for this position and successfully completed the preliminary examinations to be placed on the eligibility list. (Doc. 18 at 46:13-15). Rice received his improved rank of 79th out of 715 candidates, with a total score of 87.66. (Doc. 18-8). Rice's score placed him in the top 11% of candidates. (*Id.*) Despite this improvement, Rice was not selected from the initial group of those ranked in the top 25%, and he filed a charge with the EEOC outlining his belief that he was retaliated against on April 27, 2018. (Doc. 18-11).

Then on February 27, 2019, Rice received a letter from Burks advising him that the City's records showed that his forty-first birthday was approaching in August, and the next Fire Recruit class would not begin until October or November 2019. (Doc. 24-10). The letter directed Rice to Ohio Revised Code § 124.42, which states "No person shall be eligible to receive an original appointment on and after the person's forty-first birthday." (*Id.*)

On August 5, 2019, Rice filed a charge with the Ohio Civil Rights Commission concerning his disqualification due to his age. (Doc. 18-11). Rice remained on the eligibility list until he was

disqualified because of his age in October 2019. (Doc. 18 at 49:17-21). Rice appealed his disqualification to the CSC again but was unsuccessful. (*Id.* at 50:16-20).

## D. **Procedural History**

Rice received his Notice of Right to Sue on December 4, 2018. (Doc. 1-1). On March 18, 2019, Rice filed a two-count complaint in this Court, alleging: (1) disparate impact pursuant to the City's felony disqualification rule and retaliation for his complaints of race discrimination and filings with the EEOC pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a) et. seq; and (2) disparate impact and retaliation under Ohio's corresponding statute, Ohio Revised Code § 4112. (Doc. 1).

Following discovery, the parties filed cross-motions for summary judgment. (Docs. 23, 24). Rice now moves to re-open discovery to allow him to depose the City's attorney, William Hicks, and Assistant Chief for Human Resources, Steven Breitfelder, for the limited purpose of determining whether the Fire Chief had knowledge of Rice's EEOC filings. (Doc. 27).

### *Standard of Review*

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). While the Court views the evidence in the light most favorable to the nonmoving party, the nonmoving party "must come forward with

specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. ANALYSIS[2]

### A. <u>Disparate Impact</u>

Title VII proscribes "not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971). Under Title VII, Congress required "the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of race or other impermissible classification."[3] *Id.*

To establish a disparate impact claim, plaintiffs must prove that a particular employment practice, while neutral on its face, produced a significant adverse effect on a protected group to which the plaintiff belongs that cannot be justified by business necessity. *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 830 (6th Cir. 2000)

---

[2] To begin, Rice asks the Court to strike the City's motion for summary judgment because it failed to file proposed undisputed facts to comply with the Magistrate Judge's General Standing Order. (Doc. 26 at 2). This request is denied because this Court did not order the parties to make such filings, and the facts from Rice's proposed undisputed facts are substantially undisputed.
[3] Like Rice's retaliation claim *infra*, the same standard for disparate impact is applied through Ohio's corresponding statutes, permitting this Court to analyze both under Title VII's standards. *Woods v. FacilitySource, LLC*, 640 Fed. App'x 478, 483 (6th Cir. 2016); *Braun v. Ultimate Jetcharters, LLC.*, 828 F.3d 501, 510 (6th Cir. 2016) (citations omitted).

Rice's complaint alleges that the City's "sweeping, absolute disqualification of applicants with felony convictions and non-marijuana drug-related offenses and its refusal to adopt and apply rehabilitation standards resulted in an adverse and disparate impact" on him. (Doc. 1 at ¶ 39).

The City argues that Rice lacks standing to challenge its policy, and his disparate impact claim is substantively deficient. (Docs. 23 at 12-13, 25 at 7-15, and 33 at 2-8).

a. **Rice has standing to challenge the City's felony disqualification policy**

The initial question here is whether Rice has standing to challenge the felony disqualification policy after he was excluded from the hiring pool in 2015 and 2018.[4]

To have standing, Rice must "prove that he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct and is likely to be redressed by a favorable judicial decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). This is to ensure plaintiffs have a "personal stake in the outcome of the controversy" and suffer "some real or threatened injury." *Worth v. Seldin*, 422 U.S. 490, 498 (1975).

---

[4] Rice only challenges the policy for the 2015 and 2018 application periods because that is when he passed all portions of the exam to qualify as a candidate and had his felony conviction. In 1999, Rice was not hired, even before his felony conviction. Rice also concedes that he did not pass all portions of the exam in 2012.

The City argues that Rice lacks standing to challenge its policy because he was not taken off the eligibility list. (Doc. 23 at 12-13). The City asserts that while it has not adopted rules to include rehabilitative standards for individuals that have been convicted of or pled guilty to a felony it:

> has allowed applicants such as Mr. Rice to appeal disqualifications and offer evidence of rehabilitation to the [CSC]. In Mr. Rice's case, his appeal and evidence of rehabilitation was heard by the [CSC] and granted, reinstating him to the eligibility list.

(Doc. 24-2 at 6).

The focus, therefore, is whether Rice's successful appeal abolished his injury in fact. It has not.

Although Rice was considered for the position after winning his appeal (and theoretically not taken off the eligibility list), the lack of the City's rehabilitative standards is what creates Rice's injury in fact.

According to the City, Rice was not hired during the 2015 application process because he "was charged in December 2004 and convicted in September 2005 of drug trafficking marijuana and cocaine while certified as an EMT, Firefighter I, Volunteer Firefighter and Firefighter II." (Doc. 24-2 at 7). Chief Winston concedes that he would have considered Rice's criminal history when he made the hiring decision. (Doc. 21 at 40:7-11). Chief Winston further concedes that the CFD is not in compliance with

the required rehabilitation standards required by ORC §
737.081(E). (*Id.* at 54:8-12).

Thus, while his successful appeal allowed him to proceed in
the hiring process, Rice was not hired because he has a felony
conviction, and the City does not have rehabilitation standards in
place to consider Rice's application on an individualized basis.
Therefore, he has standing to bring his disparate impact claim.

b. **Rice cannot meet his burden for his disparate impact claim**

Nevertheless, Rice cannot establish a prima facie case of
disparate impact.

Plaintiffs establish a prima facie case of disparate impact
by identifying and challenging a specific employment practice, and
then showing an "adverse effect" by offering statistical evidence
"of a kind or degree sufficient to show that the practice in
question caused the" adverse effect in question. *Scales v. J.C.
Bradford & Co.*, 925 F.2d 901, 907 (6th Cir. 1991).

If a prima facie case is established, then the defendant must
articulate a legitimate business reason for the employment
practice. *Id.*; *See also* 42 U.S.C. § 2000e2(k)(1)(A)(i) (an employer
has the burden to show that the policy is "job related for the
position in question and consistent with business necessity").

Finally, if the defendant can establish a business necessity,
then the burden shifts back to the plaintiff to show that there
exists an alternative employment practice that would achieve the

same business ends with a less discriminatory impact. *Scales*, 925 F.2d at 907; *see also* 42 U.S.C. § 2000e-2(k)(1)(A)(ii), (C).[5]

i. **Rice's statistics do not establish a prima facie case of disparate impact**

Rice's prima facie burden requires him to show: (1) a specific employment practice; and (2) relevant statistical analysis showing the employment practice adversely impacts a protected group. *Isabel v. City of Memphis*, 404 F.3d 404, 411 (6th Cir. 2005).

First, Rice properly identified the City's felony disqualification policy as the neutral employment practice at issue that allegedly disproportionally excludes African Americans from jobs with the CFD. (Doc. 24 at 9).

Second, once a plaintiff identifies an allegedly discriminatory hiring practice, the plaintiff will generally prove causation by offering "statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 994-95 (1988) ("Once the employment practice at issue has been identified, causation must be proved").

Rice relies on his attorney, not an expert, to establish causation from his statistical analysis for his disparate impact

---

[5] As is discussed in more detail below, Rice's has not met his prima facie burden. Therefore, this Court need not address the burden shift.

claim.[6] Rice relies broadly on statistics showing that African Americans are disproportionately impacted more than Caucasians when it comes to criminal-records-based hiring disqualifications, and the City concedes this point. (Docs. 24 at 10; 33 at 6). The issue, the City argues, is this data is irrelevant because Rice has presented no evidence connecting the national statistics to the City's policy. (Doc. 33 at 6).

To show a connection, Rice considers the total number of applicants disqualified by the City's policy between 2003 and 2020. (Doc. 24 at 11). Since ORC § 737.081 was enacted in 2003 until 2020, Rice identified the following seven people that were qualified after passing the requisite examinations but ultimately disqualified by the CFD because of the felony disqualification rule in ORC § 737.081(c)(1):

(1) Daryl Strom, African American, 2004 Applicant – denied employment based on multiple disqualifying criteria.
(2) Daniel Reaver, Caucasian, 2012 Applicant – denied employment based on multiple disqualifying criteria.
(3) Elbert Hunn, African American, 2012 Applicant – denied employment based on multiple disqualifying criteria.

---

[6] The City argues Rice's statistical analysis fails because it was presented by his attorney, not an expert. (Doc. 25 at 11). Rice concedes that he did not employ an expert, but he argues that it is unnecessary to hire an expert when lay people can understand the information, and the City can cross-examine its own witnesses that compiled the data sources used. (Doc. 32 at 5-7). However, because Rice's data is incomplete to establish his prima facie case, it was improper to proceed without an expert. *See e.g., Smith v. Allstate Ins. Co.,* No. 5:04-CV-02055, 2005 WL 1540221, at *10 (N.D. Ohio June 30, 2005) ("plaintiffs' attempt to prove a disparate impact case based on their attorney's statistical analysis must fail at the outset") (quotations and citations omitted), *aff'd,* 195 Fed. App'x 389 (6th Cir. 2006).

> (4)  Ryan Jordan, African American, 2012 Applicant –
>      denied employment based on multiple disqualifying
>      criteria.
> (5)  Mark Quinn, African American, 2018 Applicant –
>      denied employment based on multiple disqualifying
>      criteria.
> (6)  James Blansford, Caucasian, 2012 Applicant – denied
>      employment based on multiple disqualifying criteria.
> (7)  Bryan Holliman, African American, 2004 Applicant –
>      denied employment based on multiple disqualifying
>      criteria.

(Doc. 24-4 at 5). In total, five African Americans and two Caucasians were disqualified because of the City's felony policy. (Doc. 24 at 11).

In 2015, Rice provides that 3,241 applicants applied, 786 (24%) being African American, 19 (less than 1%) being American Indian, 20 (less than 1%) being Asian, 64 (2%) being Hispanic, 140 (4%) being multiple races, 2 (less than 1%) being Native Hawaiian or Pacific Islander, and 2,210 (68%) being white. (Doc. 24 at 11 n. 8). Of this group, 49 (16%) African American, 1 (less than 1%) American Indian, 3 (less than 1%) Asian, 2 (less than 1%) Hispanic, 7 (2%) multiple race, and 247 (80%) Caucasian were included on the final candidate list referred to Chief Winston. (*Id.* at 12 n. 9).

In 2018, Rice provides that African Americans comprised 30% of the applicants and 19% of the final applicants. (*Id.* at 12 n. 10). Caucasians made up 62% of the applicants for that year, with 76% being part of the final applicants. (*Id.*) Rice does not provide similar numbers for any other year.

From these numbers, Rice opines that African Americans are disparately impacted because only 25% of Caucasians (out of the 68% total applicants and 80% of the final applicants in 2015) were affected in general by the felony disqualification policy, compared to 75% of African Americans generally affected.

However, it is unclear how this statistical analysis is reliable and satisfies plaintiff's initial burden. *Huguley v. General Motors Corp.*, 52 F.3d 1364, 1370 (6th Cir. 1995) (explaining that the plaintiff has the burden to produce statistical evidence showing the disproportionately negative effects of the challenged policy on the protected group). At the very least, plaintiffs must focus on the disparity between the appropriate comparator groups. *See Connecticut v. Teal*, 457 U.S. 440, 451 (1982); *Wards Cove Packaging Co. v. Antonio*, 490 U.S. 642 U.S. 651 (1989).

As Rice concedes in his cross-motion for summary judgment, "for pertinent statistical analysis, the racial stratification of the Policy's impact must be compared to the racial stratification of the hiring pool to which it applied." (Doc. 24 at 11).

To do this, Rice looks broadly at statistics between 2003 to 2020, then narrowly at the 2015 and 2018 application period. But the results seem to vary so substantially that no conclusion of disparate impact can be drawn because there is a clear disjunct between data for those qualified to those that were unqualified.

Rice applied to be a fire recruit in 1999, 2012, 2015, and 2018. However, ORC § 737.081 was enacted in 2003. Rice did not pass all portions of the exam in 2012, where two Caucasians were disqualified due to the felony disqualification rule, along with two African American. In 2015, no candidate was disqualified because of the City's policy.[7] Finally, in 2018, one African American was disqualified because of the City's policy.[8]

The Sixth Circuit provides the following explanation for establishing sufficient statistical data:

> A series of Supreme Court cases has provided guidance on what statistical data are sufficient to meet the plaintiff's burden of showing disparate impact. In cases challenging hiring practices discriminatory to African Americans, for example, **_one compares the percentage of African Americans in the job to the percentage of African Americans in the total qualified local labor force or, if labor force data is unavailable, to the percentage of otherwise-qualified African Americans in the applicant pool_**. _Wards Cove_, 490 U.S at 642. One then contrasts this ratio with the corresponding ratio for non-protected group members. An EEOC regulation provides, as a rule of thumb, that if the percentage selected from the pool comprises 80% or less of the percentage selected from the non-protected group, a discriminatory effect exists. 29 C.F.R. § 1607.4(d).

_Phillips v. Cohen_, 400 F.3d 388, 399 (6th Cir. 2005) (emphasis added).

In _Green v. Missouri Pac. R. Co._, 523 F.2d 1290, 1294 (8th Cir. 1975), on which Rice relies, the plaintiff used an expert

---

[7] As discussed above, the CSC overturned the CFD's initial disqualification of Rice.

[8] Rice was disqualified because of his age. The remaining two African Americans identified were disqualified in 2004.

witness to analyze employment applicants from the defendant's corporate headquarters from September 1, 1971, through November 7, 1973. The defendant had a strict policy not to hire applicants with any criminal record beyond minor traffic offenses. *Id.* The Court found that during that specific time frame, 3,282 African American applicants applied, compared to 5,206 Caucasians. *Id.* 174 African Americans (5.3%) were rejected in comparison to 118 Caucasians (2.23%) for the company's policy. *Id.* From these numbers, the Court found that 53 out of every 1,000 black applicants were rejected in comparison to 22 out of every 1,000 Caucasian applicants. *Id.* at 1294-95.

Here, unlike *Green*, it appears Rice is piecemealing different pools of applicants instead of the total number of qualified applicants with the total number of disqualified applicants. Yet, over a period of seventeen years, only five African Americans have been disqualified by this policy. Unlike the policy in *Green* that disqualified applicants at the outset, candidates are only disqualified for felony matters in this case after they pass all three portions of the examinations.

Still, Rice concludes generally that the disqualification of 75% of African Americans, compared to only 25% of Caucasians, establishes his prima facie case.[9] The issue with this argument is

---

[9] Because Rice was ultimately not disqualified, the plaintiff's math fails. Instead of eight applicants being disqualified (six African Americans, including Rice, and two Caucasians, equaling 75% African American and 25% Caucasian),

Rice does not present statistical evidence pertaining to the pool of qualified applicants (i.e., those who have passed all three portions of the exam) for the position he sought. *See e.g.*, *Mandala v. NTT Data, Inc.*, 975 F.3d 202, 211 (2d Cir. 2020) ("[T]he statistical analysis must, at the very least, focus on the disparity between appropriate comparator groups. In other words, the statistical analysis must reveal disparities between populations that are relevant to the claim the plaintiff seeks to prove. For instance, it would make little sense to judge a hospital's physician hiring policy by looking at the effect those polices have on a population of high school graduates; most members of that group will be ineligible for the job irrespective of the challenged policy, because they lack a medical degree").

Rice's statistical analysis, therefore, utilizes an incomplete data set. According to the Sixth Circuit,

> [t]he value of statistical proof, however, must be evaluated in light of the total circumstances presented in a given case . . . and an incomplete or inextensive statistical analysis has little probative value . . . Likewise, simplistic percentage comparisons based on small sample sizes are a basis for concern as to their relevancy.

*Rowe v. Cleveland Pneumatic Co.*, 690 F.2d 88, 94 (6th Cir. 1982).

In sum, Rice has not presented a statistical analysis regarding the racial impact of the City's felony disqualification

---

only five African Americans were verified as disqualified because of the City's policy (five African Americans and two Caucasians, equaling 71% African Americans disqualified to 28% Caucasian).

policy.[10] The Court thus concludes that Rice has failed to establish a prima facie case of disparate impact discrimination.

## B.  **Retaliation**

Next, Rice alleges retaliation under Title VII and Ohio's corresponding law against the City. (Doc. 1 at ¶¶ 35-41). To establish a prima facie case of unlawful retaliation under Title VII, Rice must show that: "(1) he engaged in activity that Title VII protects; (2) defendants knew that he engaged in this protected activity; (3) the defendant subsequently took an adverse employment action against the plaintiff; and (4) a causal connection between the protected activity and the adverse employment action exists." *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003) (citations omitted).

If Rice meets this initial burden, then the City must offer a legitimate, non-retaliatory reason for its actions, and if the City meets its burden, then Rice must establish that the City's

---

[10] Rice's small sample size of seven disqualifications over seventeen years (only five being African American) also limits the usefulness of the statistics. *See Blair v. Henry Filters, Inc.*, 505 F.3d 517, 530 n. 12 (6th Cir. 2007) (concluding that the evidence was "of doubtful relevance" where the sample size appeared to be very small and the parties did not present statistical analysis on that data); *see also Black v. City of Akron*, 831 F.2d 131, 134 (6th Cir. 1987) (finding small sample sizes to be of little value in applying the EEOC's 80% rule used for disparate impact claims); *Garner v. Runyon*, 769 F.Supp. 357, 361 (N.D. Al. Apr. 18, 1991) (finding the statistics disqualifying 8 people because of the defendant's policy of a "clean" disciplinary record to be insufficient because "[t]his scant statistical evidence within a very small universe is not of the kind and degree to demonstrate statistically that the practice actually caused the exclusion of black applicant").

reason was pretext. *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 775 (6th Cir. 2018).

The City argues that Rice cannot establish elements two and four of his prima facie case. (Doc. 23 at 18-19). Furthermore, the City argues that even if Rice could establish a prima facie case of retaliation, he cannot establish pretext.

a. **Rice's Motion to Re-Open Discovery**

Before turning to the merits of his retaliation claim, Rice asks this Court to re-open discovery because the City asserted new allegations that Chief Winston did not learn about Rice's EEOC filings through the normal course. (Doc. 27 at 1). Since Chief Winston is the only person vested with the final hiring decisions, this creates an issue of whether Rice can meet the knowledge element. But, as explained below, there is sufficient evidence for a jury to conclude that Chief Winston had knowledge of Rice's protective activity. Therefore, Rice's motion will be denied.

b. **Chief Winston's knowledge of Rice's EEOC complaints**

As discussed above, the parties contest whether Chief Winston had knowledge of Rice's EEOC complaints when he did not hire Rice as a fire recruit. The City argues that courts should not imply knowledge to a decisionmaker solely because others within the entity were aware. (Doc. 25 at 16). That is not the case here.

Rice does not speculate that Chief Winston might have had knowledge about the EEOC complaints merely because of his position.

Instead, Rice relies on Chief Winston's deposition testimony conceding that it is the general practice for the Assistant Chief of Human Resources Breitfelder to update him verbally (after talking to the City's attorney) when a new EEOC complaint is filed. (Doc. 21 at 47:1-3). In his deposition, Chief Winston stated:

> Q: At what point, did you did you find out that Mr. Rice had filed his EEOC claim?
>
> A: I can't honestly say that I even recall that. Those usually go the Assistant Chief of Human Resources. ***If he said something about it, it would have been in passing*** . . .
>
> Q: What is the process in general if an EEOC complaint gets filed related to the Cincinnati Fire Department?
>
> A: Usually, whoever is involved in it, you know, the city attorneys, whoever has been assigned that works with the individual. They will usually work with the Human Resources Assistant Chief. And they, in turn, will work with whoever the people that are needed, that are involved in the charge.
>
> . . .
>
> Q: What do you do when you find out that there is an EEOC complaint?
>
> A: I guess, normally just have correspondence with the attorneys that have been assigned the case under, you know, most instances, but our representatives for law is our Assistant Chief of Human Resources. So, he's the one that's going to have most of the discussions. ***Then he would just update or brief me as needed***.

(*Id.* at 44-45, 47) (emphasis added).

In *Mulhall v. Ashcroft*, 287 F.3d 543, 551 (6th Cir. 2002), the Sixth Circuit held that the plaintiff did not present direct or circumstantial evidence that the defendant knew the plaintiff

was listed as a witness on the EEOC complaint when he committed the adverse employment action. Conversely, the Sixth Circuit has found that circumstantial evidence is sufficient where the defendant was likely aware of the plaintiff's protected activity. *Allen v. Mich. Dep't of Corr.*, 165 F.3d 405, 413 (6th Cir. 1999) (finding the defendant was aware of the plaintiff's grievance because the department supervisor knew his complaints, and he was the only African American to be returned to his previous position after he complained).

Unlike *Mulhall*, Chief Winston does not affirmatively deny having knowledge of Rice's EEOC complaint. Instead, like *Allen*, Chief Winston testified that he could have learned about Rice's EEOC complaint in passing from Breitfelder because it was normal to update him about EEOC complaints. (Doc. 21 at 44-45, 47). Chief Winston even admitted that he was informed by Breitfelder about all other discrimination complaints filed against the CFD. (*Id.* at 46:16-20). Therefore, while Chief Winston does not recall when (or if) he learned about Rice's protected activity, a reasonable jury could conclude that Chief Winston knew about it.

c. **Causal connection**

The next question is whether Rice has presented sufficient facts to establish a causal connection between not being hired and his complaints to the City.

To establish a causal connection, Rice must "proffer evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009). Closeness in time is one indicator of a causal connection. *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 364-65 (6th Cir. 2001). "[B]ut temporal proximity, standing alone, is not enough to establish a causal connection for a retaliation claim." *Spengler v. Worthington Cylinders*, 615 F.3d 481, 494 (6th Cir. 2010). Plaintiffs must produce evidence of a retaliatory motive such that a reasonable juror could conclude that the adverse action would not have occurred but for his engagement in protected activity. *Eckerman v. Tenn. Dept. of Safety*, 636 F.3d 202, 209 (6th Cir. 2010).

Chief Winston testified that he does not take notes or record how he selects candidates, but he testified that he considers the following factors: (1) skills and "ability to pass" EMT certification (Doc. 21 at 24:7-17); (2) trust, moral character, and integrity (*Id.* at 25:24-26:10); (3) letters of recommendation (*Id.* at 62:22-63:5); (4) volunteer work (*Id.* at 63:7-12); and fire-service-based education (*Id.* at 63:23-64:15).

Based on this criteria in conjunction with his test scores, Rice believes he should have been selected because he was previously EMT certified, his letters of recommendations establish his trust, moral, character, he frequently participated in

volunteer work, and he has an Associate's Degree in Fire Service Technology. (Doc. 20-21).

The City argues that hiring decisions are made over periods of several months, and Chief Winston's inability to recall Rice's complaints destroys the causal connection. (Doc. 33 at 15-16).

In this case, Rice has presented sufficient evidence to establish a reasonable inference of a causal connection. *Little*, 265 F.3d at 365 ("temporal proximity, when considered with the other evidence of retaliatory conduct, is sufficient to create a genuine issue of material fact as to" a causal connection"). The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met. *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997).

The application periods at issue here are 2015 and 2018. As the evidence shows, Rice was initially disqualified from the 2015 application process on August 4, 2017, after the CFD discovered his felony conviction in his PQH and background check. (Doc. 19-2 at 1). After Rice was unsuccessful with his pre-appeal, he filed an EEOC charge on August 9, 2017, alleging the City's felon disqualification policy was racial discrimination. (Doc. 19-9).

On October 5, 2017, the CSC heard Rice's appeal concerning his felony disqualification. (Doc. 18 at 43:11-14). The CSC unanimously approved Rice's request to remain eligible for the fire recruit position. (Doc. 24-8 at 4). But even after his

successful appeal, Rice was not hired for the 2015 posting. (Doc. 24-2 at 7).

Then in 2018, Rice applied again for a fire recruit position, and he improved his rank to 79 out of 715 candidates (placing him in the top 25% of candidates). (Doc. 18 at 46:13-15). Despite this improvement, Rice was not selected again from the initial group, and he filed a charge with the EEOC outlining his belief that he was retaliated against on April 27, 2018. (Doc. 18-11). Chief Winston also selected at least twenty-three candidates with scores lower than Rice. (Doc. 20-8). Several months later, Rice received a letter from Burks advising him that the City's records showed that his forty-first birthday was approaching in August, and he was being disqualified because of his age. (Doc. 24-10).

These facts show that a reasonable jury could infer a causal connection between Rice's appeals and EEOC complaints prompted Chief Winston to not hire him.

   d. **Rice fails to show pretext**

Regardless, Rice's retaliation claim fails because he cannot show the City's non-discriminatory reason is a pretext. The City offered a legitimate, non-discriminatory justification for hiring other candidates that better matched Chief Winston's desire for candidates with skill, ability to pass EMT certification, and trustworthiness. (Doc. 25 at 17). Chief Winston testified that while everyone has weaknesses on their applications, he must

determine whether a person's weaknesses will leave the CFD vulnerable. (*Id.* at 24:1-6). The City explained that Rice was ultimately not hired in 2015 because of his 2005 drug trafficking conviction that occurred after he received his firefighter and EMT certifications. (Doc. 24-2 at 7).

To show that this proffered reason was pretext, Rice must show that the City hired less qualified applicants. *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457-58 (2006). Rice concedes that he does not know the qualifications of the applicants who ranked lower than him. (Doc. 50:8-15).

Because Rice has the burden to establish that he was more qualified than the individuals selected below him, he must "present some admissible evidence that would allow the jury to conclude that the selection of candidates contradicts the defendants' purported criteria." *Hopkins v. Canton City Bd. Of Ed.*, 477 F. App'x 349, 357 (6th Cir. 2012).

Chief Winston testified that he believed all candidates on the eligibility list were equally qualified once he began the selection process. (Doc. 21 at 21). Nevertheless, Chief Winston's hiring decisions require the City to utilize resources to train all fire candidates he selects. This means to avoid expending funds on candidates with certain flaws, Chief Winston must determine who he and the community can rely on when help is needed. Accordingly, Rice cannot show that Chief Winston's concern about Rice's drug

trafficking charge after he received his various certifications was pretext for him complaining about the lack of rehabilitative standards.

In sum, since Rice does not offer any evidence to show that the City's legitimate, non-discriminatory justification is pretext, he fails to raise a triable issue as to retaliation.

*CONCLUSIONS*

Thus, having reviewed this matter, and the Court being advised,

**IT IS ORDERED** as follows:

A. The City's motion for summary judgment, (Doc. 23), be, and is hereby, **GRANTED.**

B. Rice's cross-motion for summary judgment, (Doc. 24), be, and is hereby, **DENIED.**

C. Rice's motion to re-open discovery, (Doc. 27), be, and is hereby, **DENIED.**

D. A separate judgment shall enter concurrently herewith.


This 7th day of May 2021.



**Signed By:**

**William O. Bertelsman**

**United States District Judge**